Filed 11/20/15  P. v. Hathcox CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JACKIE THOMAS HATHCOX,<br><br>Defendant and Appellant. | F068884<br><br>(Super. Ct. No. 1438379)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

William I. Parks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Jackie Thomas Hathcox guilty of stalking (Pen. Code, § 646.9, subd. (b)),[1] two counts of making a criminal threat (§ 422), and violation of a protective order (§ 166, subd. (c)(1)), a misdemeanor. In a bifurcated proceeding, the trial court found Hathcox suffered a prior conviction for voluntary manslaughter, a serious felony, in 1976 (§ 667, subds. (a), (d)). For his felony convictions, he received an aggregate term of 13 years 8 months in prison.

Hathcox challenges one of the convictions of making a criminal threat as unsupported by substantial evidence, and he contends the stalking charge under section 646.9 should have been barred because a more specific statute applied to his conduct. He further claims the prior serious felony conviction should not have been used to increase his punishment because it was obtained in violation of his *Boykin-Tahl* rights[2] and, alternatively, the trial court abused its discretion in denying his *Romero* motion[3] to strike the prior conviction.

We affirm the judgment.

## *FACTS*

Cheryl worked as an outreach counselor for a ministry in Modesto that provided community services and Bible study. Her clients were often homeless, suffered from addiction, or were "just people … going through a really rough time in life." Clients could see her at the ministry and call her at her work cell phone. In June 2011, Hathcox had been Cheryl's client for about three or four years. On average, Cheryl would see him about once a week or once every two weeks, although she sometimes would not see him for a longer period of time. Her relationship with Hathcox was strictly professional; Cheryl had no personal relationship with him outside of the ministry.

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

[2]     *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122.

[3]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

2.

One day in June 2011, Cheryl saw Hathcox as she was driving to work. He yelled her name. She turned around, waved at him, and said, "'Hi, Jackie.'" About one-half hour later, Hathcox appeared at the ministry, and Cheryl went outside to talk to him. She testified, "[H]e started ranting and raving, and cussing—cussing up a storm at me, telling me he was—I don't even remember what he said to me…. I remember him saying something to the effect of, 'I guess I'll live the rest of my life all alone,' and on, and on, and on, and cussing, and cussing, and cussing." Cheryl told him he did not need to be there that day, and he left.

The same day, Hathcox called Cheryl and left a voicemail message similar to his earlier in-person "ranting and raving." After that day, Cheryl received hang-up calls from five to 92 times per day. She also received voicemail messages from Hathcox. In the messages, Hathcox said "he wanted to kick [Cheryl's] husband's ass" and "threaten[ed] to hurt [her] family and [Cheryl]."

Cheryl told Hathcox on the telephone to stop calling. She asked him what he wanted, and he did not answer. After she realized the calls were not going to stop, Cheryl obtained a restraining order against Hathcox. The court ordered him not to harass, follow, or stalk Cheryl and not to contact or telephone her. Hathcox had notice of the restraining order by September 1, 2011.

After September 1, 2011, Hathcox did not stop calling Cheryl. Instead, Cheryl felt that the voicemail messages he left became worse. She testified, "That's when the threats began to come about, you know, 'I'm going to poke you, poke your husband's brother, sister,' my kids and stuff." She understood "poke" to mean stab with a knife. The messages made her feel in danger. The jury was played a recording of 21 selected voicemail messages Cheryl received. In one message, Hathcox said, "I'm in front of Save Mart right now, people are shopping, listen to this, can you hear me?" Then he said Cheryl's full name and her home address. In another message, he told her, "see if you can see what's missing out there" and then described her residence. In another, Hathcox

said, "You know our father Satan says you gotta die. Don't hold your breath. You got problems coming real soon. I've talked to Laura Nelson (unintelligible) and the pastor of the church. Your time[']s up."[4] Nelson was the vice president of administration of the parent organization of the ministry.

On September 15, 2011, Hathcox left a message in which he said he was going to kick Cheryl's husband's ass. Cheryl felt that he was going to "beat up, take down, maybe even kill" her husband. Cheryl added, "I don't know kill necessarily, but definitely telling me he was going to beat him up." Cheryl was in fear of Hathcox beating up her husband from that point on.

On October 21, 2011, Hathcox left a message, which Cheryl described as follows: "Bring it on. He's got his shit together, and he's going to [fucking] stick me, my brother and my husband, my sister, whoever, and [']I'm not afraid.['] He says actually, 'Three hots and a cot sounds pretty good to me right now.'" Cheryl understood "stick" to mean stab. This message caused her concern for herself and her family and she was afraid from that point on. The phone calls, including the hang-up calls, were traced to different payphones and a couple motels.

Laura Nelson did not know Hathcox. In the summer of 2011, Nelson received several telephone calls from a man asking for Cheryl. On July 27, 2011, the caller said, "'What does she have to do with Lucifer?'" and hung up. On August 8, 2011, she

---

**4**     In other voicemail messages, Hathcox called Cheryl a "stupid whore," "nothing but a slut," "adult[e]ress," "a hypocrite and a liar," "rotten, fucking piece of shit, bitch, rat mother fucker," and "[n]igger lover." In one message, he said, "Listen you stupid whore (unintelligible) one of these days I'm going to split you all over town, I swear on my skin I will and your old man's got an ass whipping coming. You ain[']t nothing but a slut." In another, he said, "[Cheryl], if you think it's over, you're in for a big surprise lady. You're going to be hurting. Your friends are going to be hurting. Your job[']s going to be hurting. [Cheryl's workplace] is going to be hurting. Everything is going to be hurting. It's a matter of time, you'll know when it happens. Have a good nigger fucking sucking day." In another, "I want you to know one thing. On my mother's grave, I know where you live. Stupid bitch. You lying mother fucking bitch.… Your days are done you mother fucking cunt."

4.

received a message from the same person. He said he was from the ministry and "he had just found Satanism, and it was different. It was more powerful. It gave him more than what he got from sugar-coated Christians, and so he was just feeling good about it." Nelson recorded 12 messages from the caller, and she hung up on other calls because the caller was being obscene. Cheryl played voicemail messages from Hathcox for Nelson, and Nelson recognized the voice and manner of speaking as similar to that of the caller who had been calling her and asking for Cheryl.

## *PROCEDURAL HISTORY*

Hathcox was charged with stalking Cheryl between September 2 through October 31, 2011 (§ 646.9, subd. (b); count I), making a criminal threat to Cheryl on September 15, 2011 (§ 422; count II), making a criminal threat to Cheryl on October 21, 2011 (§ 422; count III), and violating a restraining order, a misdemeanor (§166, subd. (c)(1); count IV). It was further alleged that he had been convicted of a serious felony in 1976, voluntary manslaughter, and that his current charges included serious felony offenses (§§ 1192.7, subd. (c); 667, subds. (a), (d)).

Before trial, Hathcox filed a *Romero* motion to strike the allegation of a prior serious felony conviction. The People opposed, and the trial court denied the motion.

A trial was held, and the jury found Hathcox guilty as charged. In a subsequent court trial, the court found true the allegation that Hathcox suffered a prior serious felony conviction.

Hathcox then moved to strike the allegation of a prior serious felony conviction, claiming the prior conviction was obtained in violation of his *Boykin-Tahl* rights. The People opposed, and the trial court denied the motion.

The trial court imposed a term of 13 years 8 months, calculated as follows: for count 1, the middle term of three years doubled (six years), for counts 2 and 3, one-third the middle term of two years doubled (one year four months for each count), plus five

years for the prior serious felony conviction. In addition, the court ordered Hathcox to serve 30 days for count 4, misdemeanor violation of a restraining order.

## *DISCUSSION*

### I. *Sufficiency of the evidence to support count 2*

Hathcox contends the evidence that he made a criminal threat against Cheryl or her family on September 15, 2011, as alleged in count 2, was insubstantial as a matter of law. We disagree.

In assessing a claim of insufficient evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.… A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*Ibid.*)

To prove the crime of making a criminal threat under section 422, the prosecution must establish the following five elements: (1) the defendant willfully threatened to commit a crime that "will result in death or great bodily injury"; (2) the defendant made the threat with specific intent that the statement was to be taken as a threat, even if the defendant had no intention of carrying it out; (3) the threat, "on its face and under the circumstances in which it [was] made, [was] so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat"; (4) the threat actually caused the person threatened to be in sustained fear for his or her own safety or for his or her immediate family's

6.

safety; and (5) the threatened person's fear was reasonable under the circumstances. (§ 422, subd. (a); *People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

Here, Hathcox left Cheryl a voicemail message on September 15, 2011, in which he stated that he was going to kick her husband's ass. Cheryl testified that the message "[m]ade me feel like he was looking to take out my husband, or beat him up, whatever." By "take out," Cheryl explained, "I mean beat up, take down, maybe even kill. I don't know kill necessarily, but definitely telling me he was going beat him up." She was in fear of Hathcox acting on the threat from that point on. Viewing the record in a light most favorable to the judgment, we conclude there was sufficient evidence to support the guilty verdict for count 2.

Hathcox claims there was insufficient evidence of the third element, a threat that conveyed "an immediate prospect of execution of the threat." (§ 422, subd. (a).) "[T]he determination whether a defendant intended his words to be taken as a threat, and whether the words were sufficiently unequivocal, unconditional, immediate and specific [that] they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone. The parties' history can also be considered as one of the relevant circumstances." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340.) Hathcox asserts that, although there were "a lot of telephone calls and a lot of obscene language used," there was no history of violence, physical confrontations, or display of weapons. However, he cites no authority for the proposition that prior violence or a display of weapons is *necessary* to establish a criminal threat under section 422. The evidence showed that Hathcox ranted and raved at Cheryl, "cussing up a storm," at her workplace in June 2011, that he then began calling her and either hanging up or leaving insulting, sexually explicit, racially offensive, and threatening messages, and that Cheryl obtained a restraining order by September 1, 2011. In response to the restraining order, Hathcox did not stop calling Cheryl and his messages became more threatening. Hathcox indicated

that he knew where Cheryl lived and what her house looked like.  Considering Hathcox's escalating hostile conduct toward Cheryl in the preceding months, a rational jury could determine that the voicemail message of September 15, 2011, conveyed an immediacy of purpose and immediate prospect of execution of the threat.

Hathcox points out that Cheryl waited weeks before obtaining a restraining order. By this fact he intends to show that Cheryl was not that concerned about Hathcox's messages.  But Cheryl obtained a restraining order more than two weeks *before* the September 15, 2011, voicemail message, suggesting that she grew more concerned as the calls continued.  Further, Hathcox ignored the court's order not to telephone Cheryl, and, at that point, his messages became *more* threatening to Cheryl.  Certainly, the evidence that Cheryl waited until sometime before September 2, 2011, to obtain a restraining order did not preclude a finding that the threat made on September 15, 2011, conveyed an immediacy purpose.  We also reject Hathcox's argument that the fact he took no action to carry out his threat "spoke volumes as to the absence of proof that the alleged threats conveyed any immediacy of execution."  (Italics omitted.)  Section 422 does not require that the defendant act on the threat.  Indeed, the statute applies "even if there is no intent of actually carrying [the threat] out."  (§ 422, subd. (a).)

Hathcox next claims there was insufficient evidence of the second element, a threat "to commit a crime which will result in death or great bodily injury to another person."  (§ 422, subd. (a).)  Specifically, he argues that a threat to kick someone's ass falls short of a threat to leave someone with great bodily injury.  We are not persuaded. For criminal law purposes, "'great bodily injury'" is defined as "a significant or substantial physical injury."  (§ 12022.7, subd. (f).)  "An examination of California case law reveals that some physical pain or damage, such as lacerations, bruises, or abrasions is sufficient for a finding of 'great bodily injury.'  [Citations.]"  (*People v. Washington* (2012) 210 Cal.App.4th 1042, 1047.)  Cheryl understood Hathcox's threat to "kick [her] husband's ass" as meaning he would "beat up [or] take down" her husband, which was a

8.

reasonable understanding in the context of the other messages he left.[5]  A rational jury could find that Hathcox's threat to kick Cheryl's husband's ass was a threat to commit a crime (such as battery) that would result in "lacerations, bruises, or abrasions" sufficient to constitute great bodily injury.  (*Ibid.*)  Accordingly, Hathcox's substantial-evidence challenge to his conviction of count 2 fails.

## II.     *Prosecution under section 646.9*

Hathcox contends his prosecution for stalking under section 646.9 should have been barred by the rule of law precluding a prosecution under a general statute if a more specific statute is factually applicable.  We conclude this rule, which we refer to as the *Williamson* rule,[6] does not bar Hathcox's stalking conviction.

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute.  In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute.  [Citation.]  'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.'  [Citation.]"  (*Murphy*, *supra*, 52 Cal.4th at p. 86.)

"Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the

---

**5**      In other messages, Hathcox threatened to poke or stick Cheryl and members of her family, which she understood to mean stab.  In one message, Hathcox said, "[I]f you think it's over, you're in for a big surprise lady.  You're going to be hurting."  Given the tenor of Hathcox's messages, Cheryl reasonably understood "kick [her] husband's ass" to mean physically beat up, and not one of the less threatening meanings suggested by Hathcox.

**6**      In *People v. York* (1998) 60 Cal.App.4th 1499, 1503, cited by Hathcox, this rule was referred to as the "*Swann-Gilbert* rule."  (*Ibid.*, citing *People v. Gilbert* (1969) 1 Cal.3d 475, 479; *People v. Swann* (1963) 213 Cal.App.2d 447, 449.)  More recently, the California Supreme Court has recognized it as the "*Williamson* rule."  (*People v. Murphy* (2011) 52 Cal.4th 81, 86 (*Murphy*), citing *In re Williamson* (1954) 43 Cal.2d 651, 654.)

9.

face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' [Citation.]" (*Murphy*, *supra*, 52 Cal.4th at p. 86.)

"On the other hand, if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the general statute. In such situations, because the general statute contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely." (*Murphy*, *supra*, 52 Cal.4th at p. 87.)

Hathcox argues the more specific statute that is factually applicable in his case is section 653m, subdivision (b), which provides:

> "Every person who, with *intent to annoy or harass*, makes repeated telephone calls or makes repeated contact by means of an electronic communication device, or makes any combination of calls or contact, to another person is, whether or not conversation ensues from making the telephone call or contact by means of an electronic communication device, guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith or during the ordinary course and scope of business." (Italics added.)[7]

The stalking statute under which Hathcox was convicted provides in pertinent part:

> "(a) Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who *makes a credible threat with the intent to place that person in reasonable fear* for

---

[7]    Section 653m, subdivision (a), provides: "Every person who, with intent to annoy, telephones or makes contact by means of an electronic communication device with another and addresses to or about the other person any obscene language or addresses to the other person any threat to inflict injury to the person or property of the person addressed or any member of his or her family, is guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith."

10.

his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking ….

"(b) Any person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party, shall be punished by imprisonment in the state prison for two, three, or four years." (§ 646.9, subds. (a), (b), italics added.)

"The purpose of section 653m is to deter people from making harassing telephone calls with the intent to annoy and thus, to secure an individual's right to privacy against unwanted intrusion." (*People v. Hernandez* (1991) 231 Cal.App.3d 1376, 1384.) A defendant who repeatedly calls a person and hangs up with the intent to annoy that person is acting in violation of section 653m, subdivision (b). Such a defendant, however, is not in violation of section 646.9 because the defendant's conduct does not involve a credible threat made with the intent to place the person in fear. Similarly, a defendant who makes obscene, but nonthreatening, phone calls with intent to annoy would violate section 653m, subdivision (a), but would not be in violation of the stalking statute. Thus, the *Williamson* rule does not apply in this case because a violation of section 653m will not "'necessarily or commonly result in a violation of'" section 646.9. (*Murphy*, *supra*, 52 Cal.4th at p. 86.)

Stated differently, the stalking statute contains an element that is not contained in section 653m, namely "mak[ing] a credible threat with the intent to place [the victim] in reasonable fear for his or her safety, or the safety of his or her immediate family" (§ 646.9, subd. (a)), and that element would not commonly occur in the context of a violation of section 653m. (We also note that § 646.9 also requires malicious and willful conduct, which is not required under § 653m.) Clearly, conduct intended to place the victim in reasonable fear for his or her own safety or the safety of his or her immediate family involves a more serious intrusion to the victim's privacy and is likely to cause greater harm to the victim than conduct intended only to annoy or harass. Therefore, we conclude section 646.9 "contemplates more culpable conduct, [and] it is reasonable to

11.

infer that the Legislature intended to punish such conduct more severely" than the conduct targeted by section 653m (which, in general, would include prank or obscene phone calls or electronic communication). (*Murphy*, *supra*, 52 Cal.4th at p. 87.) As a result, the *Williamson* rule does not apply.

Hathcox also appears to suggest the trial court erred by not instructing the jury on section 653m. However, he does not challenge the trial court's ruling that section 653m was not a lesser-included offense of the stalking charge in this case. Because Hathcox had no unilateral right to a jury instruction on a nonincluded offense, we see no error in the court's refusal to instruct the jury on section 653m. (See *People v. Birks* (1998) 19 Cal.4th 108, 136.)

## III.    *Constitutional validity of the prior serious felony conviction*

Hatchcox next claims the trial court erred by failing to strike his prior serious felony conviction because the conviction was obtained in violation of his constitutional rights. We find no error.

### A.    *Background*

After the trial court found he had suffered a prior serious felony conviction on or about April 27, 1976, for the offense of voluntary manslaughter, Hathcox moved to strike the prior serious felony conviction, claiming the conviction was constitutionally invalid. In support of the motion, he filed a declaration, in which he stated, "I was not advised of my right to counsel, privilege against self-incrimination, right to trial by jury, and right of confrontation of witnesses against me, or right to the subpoena power of the court, at the time of my plea in case number 135717 [the 1976 criminal case that resulted in his conviction of voluntary manslaughter]." He further declared that he "did not expressly waive the above-mentioned rights during [his] plea" and, had he been advised of these rights, he would not have given a plea.

He also submitted copies of the complaint, information, and a minute order from *People v. Hathcox* (Super. Ct. Stanislaus County, 1976, No. 135717). The information

showed Hathcox had been charged with murder and forcible rape. The minute order, dated April 7, 1976, showed that, after a jury trial commenced, Hathcox requested a change of plea. The order provides:

> "Counsel for the Defendant, with consent of said Defendant moves the Court to allow the Defendant to withdraw his former plea of not guilty to Count I [murder] and to enter a new and different plea.

> "Defendant is informed of his Constitutional right to jury trial, to confront & cross examine witnesses, and against self-incrimination and of possible penalties. Defendant waives each of his Constitutional rights.

> "Thereafter, the Defendant's motion is granted.

> "Defendant waives the reading of the Information, and enters a plea of GUILTY to Violation of Section 192[, subdivision] 1 of the California Penal Code, a Felony, a lesser and included offense within the offense as charged in Count I of the Information, Voluntary Manslaughter.

> "Upon motion by Counsel for the People, IT IS ORDERED that Count II is dismissed in the interest of justice.

> "The Court finds Defendant made an intelligent waiver of his rights, and he freely and voluntarily entered a plea of guilty."

Arguing the motion to strike, defense counsel explained that Hathcox was not denying the plea was entered, "He was saying that the form and fashion and method of the plea taken … is not commensurate with the requirements of the *Boykin-Tahl* law." There was no reporter's transcript of the 1976 plea hearing.

The court assumed that, in 1976, the court clerk would have taken notes in the courtroom and then typed up the minutes on a typewriter. The court noted that the minutes recorded that Hathcox was informed of his constitutional rights. The court asked if there were any reason to find the minute order to be inaccurate. Hathcox's attorney did not dispute the accuracy of the minutes, but responded, "When you analyze it in light of *Boykin-Tahl*, it seems that this is insufficient." She further argued, "I don't believe this paragraph [the second paragraph of the minute order quoted above] gives enough

13.

indication to this Court that Mr. Hathcox was read those rights, he understood each one of those rights, and then he expressly waived each one of those rights for the plea."

The court denied the motion to strike the prior conviction. Before stating its ruling, the court made the following findings:

> "The Court finds that the clerk's minutes are sufficient to document [Hathcox] being informed of the *Boykin-Tahl* rights and [his] waiver of those rights. And the Court also finds that the document shows that the judge at the time found that [Hathcox] made an intelligent waiver of his rights and that he freely and voluntarily entered his plea of guilty.

> "The Court reviewed Mr. Hathcox's declaration. And while I understand his assertion, quite frankly, it's very difficult for me to remember a conversation 10 years ago, let alone a conversation, even an important conversation, that I might have had back in 1976. [¶] For that reason, and just knowing that with [passing] time people forget the specifics, and they only remember the general. The Court does not find Mr. Hathcox's declaration credible."

### B.     Analysis

A defendant may move to strike an alleged prior felony conviction on the ground the conviction is invalid because the trial court in the prior proceeding failed to comply with the defendant's *Boykin-Tahl* rights. (*People v. Allen* (1999) 21 Cal.4th 424, 435 (*Allen*); *People v. Sumstine* (1984) 36 Cal.3d 909, 918–919.) *Boykin-Tahl* rights refer to the requirement that a defendant must be advised of and waive (1) the privilege against self-incrimination, (2) the right to trial by jury, and (3) the right to confront his or her accusers before a trial court may accept the defendant's guilty plea. (See *People v. Mosby* (2004) 33 Cal.4th 353, 359–360 (*Mosby*).) In assessing the validity of a plea, however, the ultimate question is not whether the defendant received express rights advisements and expressly waived them but, rather, whether the defendant's plea was intelligent and voluntary because it was given with an understanding of the rights waived. (*Id*. at p. 361.) Thus, the issue to be determined in a motion to strike is the voluntariness of the prior plea. (*Allen*, *supra*, at p. 439.)

14.

"When a defendant makes sufficient allegations that his conviction, by plea, in the prior felony proceedings was obtained in violation of his constitutional *Boykin-Tahl* rights, the trial court must hold an evidentiary hearing. At the hearing, the prosecution bears the initial burden of producing evidence that the defendant did indeed suffer the conviction. The defendant must then produce evidence to demonstrate his *Boykin-Tahl* rights were infringed. The prosecution then has the right to rebuttal, at which point reliance on a silent record will not be sufficient." (*Allen*, *supra*, 21 Cal.4th at p. 435.)

Since the defendant's motion is "a collateral attack on a presumptively final conviction …, the People need only make 'a prima facie showing of the existence of the prior conviction' (citation), whereupon the burden shifts to the defendant, who bears the burden of proving the constitutional invalidity of the conviction (citation)." (*Allen*, *supra*, 21 Cal.4th at pp. 435–436, fn. omitted.) In deciding such a motion, the trial court considers the totality of the circumstances to determine the voluntariness and intelligence of the plea. (*Id*. at p. 440.)

In the present case, there is no dispute that Hathcox was convicted of voluntary manslaughter in 1976. Therefore, the burden shifted to Hathcox to show that his conviction was invalid. In an attempt to meet that burden, Hathcox declared that he was not advised of his constitutional rights and that he did not expressly waive his rights when he entered his plea. The trial court found Hathcox's declaration not credible because it was unlikely that Hathcox could reliably remember the details of a hearing that took place over 37 years earlier. Instead, the trial court accepted the accuracy of the clerk's minutes and found that Hathcox was advised of his rights and he intelligently waived those rights as reported in the minute order. We see no error in this finding. It has been held that a trial docket sheet is "entitled to a presumption of regularity and[, absent credible contradictory evidence,] must be deemed to speak the truth." (*People v. Anderson* (1991) 1 Cal.App.4th 318, 322–323; Evid. Code, § 664.) Likewise, a clerk's minute order is entitled to a presumption of correctness. In light of the trial court's

finding that his declaration was not credible, Hathcox did not met his burden of showing his prior conviction was invalid.[8]  Accordingly, the trial court properly denied his motion to strike based on alleged constitutional invalidity.

Hathcox's legal argument in support of his claim is without merit.  He cites *Stewart v. Justice Court* (1977) 74 Cal.App.3d 607, 612, for the proposition that "the docket should show that the defendant 'expressly and explicitly waived' each specified right" (*ibid*.).  However, to the extent *Stewart* suggests a guilty plea must be set aside whenever the record lacks *express and explicit* evidence that the defendant waived each of the *Boykin-Tahl* rights, this is not a correct statement of the law.  Rather, a guilty plea is valid so long as "the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances." (*People v. Howard* (1992) 1 Cal.4th 1132, 1175.)  In *Howard*, for example, the California Supreme Court concluded a defendant's admission was voluntary and intelligent despite the absence of an explicit admonition on the privilege against self-incrimination in the record.  (*Id*. at p. 1180.)  Hathcox also relies on *People v. Torres* (1996) 43 Cal.App.4th 1073 and *People v. Garcia* (1996) 45 Cal.App.4th 1242 to support his position that the record of *Boykin-Tahl* advisements and waivers was inadequate in this case, but both of these cases were disapproved on that point by our high court in 2004.  (*Mosby*, *supra*, 33 Cal.4th at p. 365, fn. 3.)

## IV.     **Romero** *motion*

Finally, Hathcox argues the trial court abused its discretion in denying his *Romero* motion to strike the allegation of a prior serious felony conviction in the interests of justice.  We find no abuse of discretion.

### A.     *Background*

In support of his pretrial *Romero* motion, Hathcox cited the facts he was about 59 years old, his currently charged offenses were not violent felonies, and his only prior

---

[8]     Hathcox does not challenge the court's credibility determination in this appeal.

16.

serious felony conviction was over 36 years old.  He argued that, given his age, the punishment from his current charges without consideration of the prior "strike" conviction "would be more than enough for the facts of the case at hand."  He further asserted he had been treated for mental illness for years.  He was given a diagnosis of schizoaffective disorder in 1999 and was currently prescribed "the anti psychotic medication Rimron/Remeron."  Hathcox suggested his mental illness may have caused the current charges as "mental illness makes people say things that they may not otherwise say."

The People opposed the *Romero* motion.  They provided his criminal history, which they described as beginning when Hathcox was 20 years old and continuing unabated since then.  He had convictions for theft and vandalism in 1974, drunk driving, vandalism, and battery in 1975, battery of a peace officer in 1980, assault and vandalism in 1983, vandalism and drunk driving in 1994, burglary in 1995, petty theft with a prior theft conviction in 1995, and possession of a controlled substance in 2005, 2007, and 2009.  The People also disputed the suggestion that Hathcox suffered from a mental illness that explained his recent conduct.  They noted that a psychologist's evaluation did not support Hathcox's assertion of significant mental illness and Remeron is not an antipsychotic medication, but is used to treat depression.

At the hearing for the *Romero* motion, the court received letters from two of Hathcox's sisters.  His sister, Cynthia Rodriguez, wrote that Hathcox "has a big heart and is always willing to help those less fortunate than himself."  She did not provide any examples of Hathcox helping anyone, however.  Rodriguez wrote that alcohol seemed to be the core of her brother's problems and that their father was an alcoholic who was mean when he drank.  His sister, Geraldine Gray, wrote that she had seen Hathcox change over the previous 10 years.  He attended church with Gray and was mild mannered and loving to Gray and her family.  She asserted that he was remorseful and asked the court to take into consideration "that he is not a bad person."

17.

Gray also testified at the hearing. She helped Hathcox with his SSI because he was "not capable of taking care of certain types of business, speaking up for himself." Gray testified, "[I]t's difficult to communicate with [Hathcox]. He kind of just withdraw[]s and doesn't communicate. He doesn't like being around crowds and—and being confronted, [it is] difficult for him to answer certain questions." She said that Hathcox was "kind of rebellious" when he was younger. Hathcox did not contact his sister when he was arrested in the current case. Gray explained how she learned about the case: "I was not seeing my brother, and I was asking around, because I would see him from time to time. Finally, I decided to go online and looked and seen that he was incarcerated."

Defense counsel argued Hathcox was loved by his family and he loved them, his family believed he had matured and there was remorse, there was a documented mental health issue, and the prior conviction was 36 years old. The prosecutor responded that there was no evidence Hathcox was remorseful. He also argued Hathcox was not a person who "made any contributions to society" and there was still no evidence of significant mental health issues.

The trial court denied the *Romero* motion. It explained:

> "The issue before the Court is whether [Hathcox] and his past history provides a scenario that falls outside the confines of the Three Strikes law. And I do agree with [defense counsel] this is a very old strike.… And I am understanding of the fact that part of Mr. Hathcox's problems stem from his mental health issues, but that doesn't excuse his continued violations of the law, whether they are violent or non-violent. There needs to be, in my opinion, something more presented to the Court with this history to warrant the granting of the motion. So the Court is going to deny the motion."

After trial and before sentencing, Hathcox renewed his *Romero* motion. Gray again testified in support of the motion. She said Hathcox had mental health problems as a child and he was diagnosed with schizophrenia about 15 or 17 years ago. She agreed

that his mental health problems challenged Hathcox in life and led to his life circumstances. Gray testified she and Hathcox had a loving relationship and he was always concerned about her welfare. She visited Hathcox in jail. She testified, "He loves the Lord, as far as I know, had been recently still going to church."

Defense counsel again emphasized how old the prior conviction was and Hathcox's mental health issues. The prosecutor argued nothing had changed since the court previously denied the *Romero* motion. He also pointed out Hathcox had not expressed remorse or responsibility for his actions.

The trial court denied the renewed *Romero* motion. The court did not doubt that "Hathcox has had to struggle through life because of his mental health," but found "what's been put before the Court is not enough, other than the passage of time." "If the state [L]egislature or the People of the state intended that passage of time would be enough for the Court to strike a strike, then that would have been made clear in the statute. It's not. It is something for the Court to consider, but I don't have anything else."

Defense counsel argued that there was new evidence since the first *Romero* motion based on Gray's testimony about Hathcox's diagnosis of schizophrenia and his loving family connections. The court responded that it had taken Hathcox's mental health and the age of the conviction into consideration the first time and was taking these matters into consideration again in denying the motion a second time.

### B.    Analysis

In *Romero*, the California Supreme Court held that trial courts have discretion under section 1385, subdivision (a), to dismiss or strike allegations of prior felony convictions under the Three Strikes law in furtherance of justice. (*Romero*, *supra*, 13 Cal.4th at pp. 529–530.)

"[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, 'in

19.

furtherance of justice' pursuant to … section 1385[, subdivision ](a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

We review a trial court's denial of a *Romero* motion under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citations.] Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at pp. 376–377.)

Because the Three Strikes law was intended to restrict trial courts' discretion in sentencing repeat offenders, our Supreme Court has established stringent standards that a sentencing court must follow in order to deviate from the law. As described above, these standards require the court to consider whether the defendant may be deemed outside the spirit of the Three Strikes law. (*Carmony*, *supra*, 33 Cal.4th at p. 377.) Further, there is a strong presumption that any sentence that conforms to the Three Strikes law's sentencing scheme is rational and proper. (*Id*. at p. 378.)

"In light of this presumption, a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances.  For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation].  Moreover, 'the sentencing norms [established by the Three Strikes law may, as a matter of law,] produce[] an "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case.  [Citation.]"  (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

"Because the circumstances must be 'extraordinary … by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary."  (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

Here, we have no difficulty concluding the trial court did not abuse its discretion in denying Hathcox's *Romero* motion.  Hathcox argues that, despite his battles with mental illness and addiction, "he has shown to be a man of good character."  However, even if the trial court credited all of Gray's testimony, the circumstances presented were not so extraordinary as to *require* a determination that Hathcox fell outside the spirit of the Three Strikes law.

We reject Hathcox's claim that the trial court "apparently focused on his criminal history, and gave no consideration of the facts pertaining to [Hathcox]."  The court recognized that Hathcox had mental health issues that caused him "to struggle through life," and it stated it was "taking that [referring to mental health issues and the age of the conviction] into consideration" in deciding the *Romero* motion.  Thus, the record

demonstrates the trial court did consider Hathcox's personal characteristics and circumstances in deciding the *Romero* motion.

Finally, we will not assume the trial court misunderstood the bounds of its discretion. Hathcox points out that, during sentencing, the court stated that it thought an eight-year sentence would be sufficient, but it was required to impose an additional five years under section 667, subdivision (a). From this statement by the court, Hathcox suggests the court "may well have misunderstood the bounds of its discretion." We see no evidence that the trial court misunderstood its discretionary authority under section 1385 and *Romero*. The Three Strikes law restricts a trial court's discretion in sentencing repeat offenders and "carefully circumscribes the trial court's power to depart from [the sentencing] norm." (See *Carmony*, *supra*, 33 Cal.4th at pp. 377–378.) There is nothing inconsistent in the trial court in this case denying the *Romero* motion because it determined Hathcox did not fall outside the spirit of the Three Strikes law, while at the same time believing a term lower than that called for under the sentencing scheme might also be reasonable.

In summary, the trial court did not abuse its discretion in denying Hathcox's *Romero* motion.

## DISPOSITION

The judgment is affirmed.

_____
KANE, Acting P.J.

WE CONCUR:


_____
POOCHIGIAN, J.


_____
FRANSON, J.

22.